IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

SHARON CLARK,                        )
                                     )
      Plaintiff,                )
                                     )
v.                                   )   Case No. CIV-15-15-D
                                     )
THE LINCOLN NATIONAL                 )
LIFE INSURANCE COMPANY,              )
                                     )
      Defendant.                )

# ORDER

Pursuant to the civil enforcement provisions of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1), Plaintiff Sharon Clark (Clark) brings this action against Defendant, The Lincoln National Life Insurance Company (Lincoln) in which she alleges her long-term disability (LTD) benefits were wrongfully terminated. Before the Court are Clark's Opening Brief and Lincoln's Response Brief [Doc. Nos. 30, 32]. The matter is fully briefed and at issue.[1]

---

[1] The filing of Plaintiff's Opening Brief led to an internal docketing error and delay in the processing of the present case. The Court apologizes for the delay in issuing this Order and has taken steps to guard against such processing errors in the future.

# BACKGROUND

Clark was employed by McBride Orthopedic Hospital as a Radiologic Technologist, where she was enrolled for LTD benefits in the McBride Orthopedic Hospital Employee Benefits Plan, Policy No. 000010086654 ("the Policy") offered by Lincoln (R. at 99). The Policy paid monthly disability benefits following 180 calendar days of disability to an insured who remained "totally disabled" as a result of an "injury" or "sickness" (R. at 102). The Policy defined "totally disabled" as follows:

> **TOTAL DISABILITY or TOTALLY DISABLED** will be defined as follows:
> 1. During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of his or her Own Occupation.[2]
> 2. After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of any occupation which his or her training, education or experience will reasonably allow. The loss of a professional license, an occupational license or certification, or a driver's

---

[2] The Policy defined "main duties" as job tasks that (1) are normally required to perform the insured's occupation and (2) could not reasonably be modified or omitted. "Main duties" included those job tasks as described in the U.S. Department of Labor's *Dictionary of Occupational Titles* and as performed in the general labor market and national economy. The Policy further provided that an employer's failure to modify or omit other job tasks did not render the insured unable to perform the main duties of the job.

> license for any reason does not, by itself, constitute Total Disability.

(R. at 108).

Clark stopped working on March 2, 2011, due to Osteoarthrosis. On or about June 3, 2011, she submitted a claim for LTD benefits under the Policy. Lincoln initially denied her claim, but later determined Clark met the definition of "total disability" and found she was unable to perform the main duties related to her occupation (R. at 452, 511). Accordingly, Lincoln approved thirty-six (36) months of LTD benefits, beginning August 29, 2011, and concluding on August 29, 2014. On October 3, 2011, Clark was awarded Social Security Disability Benefits (R. at 479-85). On March 6, 2014, Lincoln advised Clark that the "Own Occupation Period" would expire August 29, 2014 and no future benefits would be payable because Clark's medical records failed to support a finding of "total disability." (R. at 227).

In making this determination, Lincoln relied upon a report by Dr. David Gandy, M.D., who, based on his review of Clark's medical records, concluded she would be able to perform "sedentary to light work activities." (R. at 359). Lincoln also relied on a vocational assessment performed by Cathy McDonald, M.A., C.R.C. Ms. McDonald also found that Clark would still be able to

perform "sedentary work," as defined by the U.S. Department of Labor.[3] Ms. McDonald determined Clark possessed a number of skills and abilities that would allow her to perform the main duties of numerous sedentary jobs contained in the *Dictionary of Occupational Titles*.

Ms. McDonald found that, based on the information regarding work history and duties, Clark possessed the following vocational assets: (1) the ability to understand instructions and underlying concepts, and to reason and make judgments; (2) The ability to understand the meaning of words and to use them effectively, (3) comprehend language, understand the relationship between words and the understanding of words and understand the meaning of whole sentences; (4) The ability to learn simple processes; (5); The ability to perform the same task over and over again; (6); The ability to set and meet standards; (7); the ability for simple verbal and written communication; (8); the ability and knowledge of how to observe and document observations; and (9) the ability to work effectively as a team member. Accordingly, the following positions were identified as examples of positions Clark had the

---

[3] According to the Department of Labor, "sedentary jobs" require sitting most of the day, with occasional walking or standing, and occasionally lifting less than ten (10) pounds. 20 C.F.R. § 220.132(a).

potential to perform: (1) Coordinator, Skill Training Program, (2) Radiology Administrator, and (3) Hospital-Insurance Representative (R. at 332-34).

On April 8, 2014, Clark appealed Lincoln's decision to terminate her claim for LTD benefits (R. at 203). In response, Lincoln reviewed Clark's claim file, including her medical records, to determine whether her medical records supported a finding that she was totally disabled after the expiration of the "Own Occupation Period"—August 28, 2014. Clark's file was reviewed by Dr. James Boscardin, who determined that Clark had no cognitive issues related to any documented issues within the medical records and could function at a sedentary level and could sit unlimited, or certainly for 6 hours at a time with change of position for comfort and nature calls, and without limitations on grasping, keying, or typing with either hand (R. at 217). Dr. Boscardin further found Clark could stand and walk for brief periods at a time, and with a cane, if necessary (R. at 218).

On June 2, 2014, Lincoln upheld its decision to deny Clark's claim for LTD benefits under its belief that the medical documentation did not support her claim that she was unable to perform the main duties of any occupation beyond August 28, 2014 (R. at 202). On September 18, 2014, Clark filed her second and final appeal of Lincoln's decision to uphold the termination of LTD

5

benefits (R. at 181). She submitted additional information following an office visit with Dr. Corey Ponder on August 19, 2014, including a functional capacity questionnaire, a physical residual functional capacity assessment, an office visit note, and an MRI of her thoracic spine (R. at 176-90).

Dr. Ponder's questionnaires and assessments form indicated that Clark could sit 5-6 hours a day; stand or walk 0-2 hours a day; frequently finger, handle, and reach above shoulder level; occasionally lift up to 10 pounds and rarely lift up to twenty (20) pounds; and never climb, bend or kneel. *See id*. Dr. Ponder also noted that Clark frequently experienced pain severe enough to interfere with attention and concentration needed to perform simple tasks. *Id*. Finally, the forms stated Clark had signs/symptoms of impaired sleep, muscle weaknesses, reduced range of motion, and was using a cane/walking device. *Id*. According to Dr. Ponder, Clark's impairments would cause her to be absent from work more than four days per month. *Id*.

The office visit notes with Dr. Ponder reported that Clark's knees bothered her, she had problems with her spine, and had a hemangioma with back pain over the "central aspect." (R. at 189). Clark reported that her abilities were about the same and was not taking any narcotics. *Id*. Clark also reported her right ankle discomfort was increasing. *Id*. The examination revealed her

incisions looked very good, her right knee flexion was just short of full extension to 115 degrees, her left knee motion was 5-110 degrees, and there was no effusion or subjective discomfort with passive range of motion. Clark's knees were reported as stable, and the x-rays of the knees remain unchanged. Dr. Ponder noted Clark's condition was "status quo." *Id*.

The physical residual functional capacity assessment reported that Clark could occasionally lift 10 pounds; could stand and/or walk less than 2 hours in an 8 hour day; can sit less than 6 hours in an 8 hour day; and can push and or pull 0.1 hour per day (R. at 183-84). It indicated that Clark required use of a cane full time due to greatly limited strength and decreased motion of both legs, and any functional effort lead to increased pain and the need for even more pain medication (R. at 184). The report noted that spinal stenosis could lead to neuropathy in both feet and that Clark could never climb, balance, stoop, kneel, crouch, or crawl. *Id*. Clark was said to have limited reach in all directions, but was not unlimited in handling, fingering and feeling (R. at 185). Clark had no visual or speaking limitations but was reported as having hearing limitations. *Id*. She was cautioned to avoid extreme temperatures, wetness, humidity, noise, vibration, fumes, dust, and hazards (R. at 186).

The MRI of Clark's thoracic spine showed intact vertebral bodies with straight alignment and normal disc spacing (R. at 178). There were no signs of disc protrusions or compromise of the canal or cord. *Id*. There were several hemangiomata with the largest within the left side of the vertebral bodies and a smaller one near the anterior pedicle. *Id*. There was no evidence of change from an earlier exam conducted in September 2011, nor was there any intermedullar abnormality and the exam of the paravertebral soft tissues found no discrete abnormality. *Id*.

On October 21, 2014, Lincoln upheld its decision to deny Clark's claim for LTD benefits on the grounds the medical documentation did not support her claim that she was unable to perform the main duties of any occupation beyond August 28, 2014 (R. at 176). This action followed.

**STANDARD OF REVIEW**

Under ERISA, insurance companies are to provide accurate claims processing by insisting that administrators provide a full and fair review of claim denials. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008). The United States Supreme Court has held that a denial of benefits challenged under ERISA is reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine

eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Lincoln does not contend that the Policy gives it discretionary authority to determine eligibility for benefits. *See* Def. Resp. Br. at 9. Accordingly, the Court exercises a *de novo* standard of review.

When applying *de novo* review in the ERISA context, the role of the Court is to determine whether the administrator made a correct decision. *Thompson v. Union Sec. Ins. Co.*, 688 F. Supp. 2d 1257, 1264 n. 34 (D. Kan. 2010) (citing *Niles v. American Airlines, Inc.*, 269 F. App'x. 827, 832 (10th Cir. 2008) (unpublished)). The standard is not whether "substantial evidence" or "some evidence" supports the administrator's decision, it is whether the plaintiff's claim is supported by a preponderance of the evidence based on the Court's independent review. *See id*. Although the administrator's decision is accorded no deference or presumption of correctness, the administrator's decision is still the decision under review. *Id*. Under this standard, the Court is generally limited to the administrative record—the materials compiled by the plan administrator in the course of making its decision. *Hall v. UNUM Life Ins.*

*Co. of Am.*, 300 F.3d 1197, 1201 (10th Cir. 2002); *Bigley v. Ciber, Inc.*, 853 F. Supp. 2d 1079, 1082 (D. Colo. 2011).[4]

Lastly, although the Court reviews this case *de novo*, the burden of proof remains with the plaintiff to prove by a preponderance of the evidence that she is "disabled" within the meaning of the policy. *Thompson*, 688 F. Supp. 2d at 1264. To meet this burden, Clark must prove that, as a result of her injury or medical condition, she is unable to perform at least one of the material duties of each gainful occupation for which her education, training, and experience would reasonably allow.

## DISCUSSION

Upon *de novo* review of the administrative record, the Court finds that Lincoln's decision to terminate Clark's LTD benefits should be overturned and the matter remanded on the narrow grounds stated below.

As noted *supra*, Clark applied for—and received—Social Security Disability Benefits (SSD) from the Social Security Administration (SSA). In

---

[4] On February 26, 2018, the Court denied Lincoln's Motion to Strike and permitted Clark to supplement the record with a report from Clark's vocational expert Kathy Bottroff [Doc. No. 41]. In its order, the Court found that supplementation was appropriate to conduct an adequate *de novo* review and the subject evidence was relevant to Plaintiff's allegations of a conflict of interest. *Id*.

this regard, Lincoln correctly notes that an award of SSD benefits is not necessarily determinative of a benefit claim under ERISA because there are "critical differences" between the social security disability program and ERISA benefit plans. *See* Def.'s Resp. Br. at 20 (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003)). "But even if the SSA's determination is not dispositive, it is still persuasive evidence that [Clark] is, in fact, unable to work." *Krum v. Hartford Life & Acc. Ins. Co.*, 942 F. Supp. 2d 1171, 1180 (D. Utah 2013). Lincoln gives mere lip service to the social security award in its letters denying Clark's appeal, simply noting the procedural difference between the two schemes (R. at 179, 205). Indeed, the two proceedings are different; however, as one sister court observed, "the disability standard applied by the SSA is not an easy one. To qualify for SSD benefits, [Clark] had to demonstrate that she was unable, 'considering her age, education and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which she lives.'" *See id.* (citing 42 U.S.C. § 423(d)(2)(A)).

Accordingly, "while [Lincoln] may reasonably believe that a person meeting the Social Security Disability standard does not necessarily meet the

any occupation standard under its … Policy, its failure to offer any explanation of why it believes this statement is true for [Clark's] case is a factor counseling reversal." *Krum*, 942 F. Supp. 2d at 1181. As further observed by the *Krum* court, a plan administrator's failure to consider a disability finding from the SSA is a factor supporting reversal. *Id*. Here, the record is devoid of any substantive consideration by Lincoln of Clark's SSD award.

Accordingly, the Court remands this matter to Lincoln for further explanation of its denial of Clark's LTD benefits, to include further consideration of her SSD award. Remand is appropriate where a plan administrator fails to adequately explain the grounds for its decision. *Caldwell v. Life Ins. Co. of North Am.*, 287 F.3d 1276, 1288 (10th Cir. 2002).

## CONCLUSION

Accordingly, as set forth herein, Defendant's termination of Plaintiff's LTD benefits is **REVERSED** and the matter **REMANDED** for further proceedings not inconsistent with this order.

**IT IS SO ORDERED** this 20th day of September 2018.

_____
TIMOTHY D. DEGIUSTI
UNITED STATES DISTRICT JUDGE